IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| TERENCE PASSMORE,<br><br>Petitioner,<br><br>vs.<br><br>MARTIN FRINK; ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>Respondents. | Cause No. CV 13-121-BLG-CSO<br><br><br><br>ORDER |

## I. Procedural Background

Petitioner Terence Passmore, a state prisoner, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Passmore was charged in April 2006 with committing multiple sexual offenses against C.R. and J.R. in 1998. C. was 11 and 12 at the time of the offenses. J. was 13 and 14. Passmore was an adult and the pastor at the church the R. family attended. He was represented in the criminal proceedings by attorneys Herman A. "Chuck" Watson and Gary Balaz.

Passmore was convicted of the following charges:

Count I:     sexual assault, in violation of Mont. Code Ann. § 45-5-502(1), (3)(1997), by touching C.'s breasts and/or genitalia in the summer and winter of 1998 in the parsonage or in the Passmores' shed;

Count II:     sexual intercourse without consent, in violation of Mont.

1

Code Ann. § 45-5-503(1), (3)(a) (1997), by digital penetration of C. in July 1998 in the sanctuary of the church;

Count IV:  sexual assault by touching J.'s breasts with his forearms at the Big Timber waterslide in July 1998; and

Count V:  sexual assault by pinching J.'s buttocks at Chico Hot Springs in December 1998.

Passmore was acquitted on Count III, alleging another sexual assault involving C.R. He was also acquitted on three additional counts, VI, VII, and VIII, all involving a different victim, A.M.

On April 4, 2008, Passmore was sentenced to 35 years in prison on Count II, with five of those years suspended, and concurrent ten years on Counts I, IV, and V, with five of those years suspended, followed by five years under supervision. Passmore pursued both a direct appeal and, without counsel, postconviction relief. His claims were denied. *See generally State v. Passmore*, 225 P.3d 1229 (Mont. 2010); *Passmore v. State*, No. DA 12-0258, 2013 MT 154N (Mont. June 11, 2013).

Passmore timely filed his original federal habeas petition on September 23, 2013. His amended petition, filed by counsel, presents seven claims for relief.

On June 16, 2015, the Court denied Claim 3 and portions of Claim 1 for lack of merit. *See* Order (Doc. 33) at 22. The State's defense of procedural default was rejected under the reasoning of *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012), and this Court's prior decision in *Gunderson v. Kirkegard*, No. CV 13-35-

BLG-CSO (D. Mont. Jan. 30, 2015). *See* Order at 19-21. Except as to the claims denied, the Court found that relief is not precluded by 28 U.S.C. § 2254(d). *Id.* at 4-19. The parties conducted discovery, including the depositions of eight witnesses. *See* Scheduling Order (Doc. 35).

Discovery is complete, and the following claims remain to be adjudicated:[1]

1.    Trial counsel were ineffective for failing to call witness Jake Popejoy at trial. Am. Pet. (Doc. 18) at 34-42.

2.    Trial counsel were ineffective for failing to cross-examine C. and J. by using inconsistent statements C. made to a psychologist and inconsistent or false statements made in connection with a civil lawsuit that preceded the criminal case. *Id.* at 42-51.

. . .

4.    A juror falsely stated she had no opinion about Passmore's credibility when in fact she told one person, before trial, that she "just knew that the Pastor was guilty" and told another person, after trial, that she "had believed Passmore to be guilty and that she hoped she would be on the jury." *Id.* at 54-56.

5.    Trial counsel were ineffective for failing to challenge the juror, either peremptorily or for cause, after Denton told them about the remark he overheard the juror make. *Id.* at 57-58.

6.    Trial counsel's errors cumulatively prejudiced Passmore. *Id.* at 59.

7.    Passmore's right to due process was violated by collusion between the complaining witnesses during trial, as overheard by a bailiff. *Id.* at 60.

---

[1] Passmore renumbered his claims to reflect the denial of Claim 3. The State did not renumber the claims. To preserve consistency throughout the record, this Order preserves the numbering in the amended petition.

The parties have briefed these claims. The Court has considered the parties' briefs, the extensive record, and the applicable law. It has also considered whether an evidentiary hearing should be held. For the reasons explained below, the Court concludes that an evidentiary hearing is not necessary and that the case can be resolved on the briefs and record submitted.

## II. Claims 1, 2, and 6

Claims 1, 2, and 6 allege that trial counsel were ineffective for failing to call Jake Popejoy as a witness (Claim 1) and for failing to cross-examine C. and J. effectively (Claim 2). Passmore also alleges that he was cumulatively prejudiced as a result (Claim 6).

Although Claim 5 also alleges ineffective assistance of counsel, it arises from jury issues and the factual background thus differs from Claims 1 and 2. Claim 5 is addressed in Part III along with Claim 4, which also concerns jury issues.

### A. Legal Standards

Because the Court previously found that relief is not precluded under 28 U.S.C. § 2254(d), Passmore's claims are reviewed de novo to determine whether he has shown a federal constitutional violation. *See Runningeagle v. Ryan,* 686 F.3d 758, 785-86 (9th Cir. 2012); *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (en banc).

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Passmore must demonstrate both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See also Lafler v. Cooper*, __ U.S. __, 132 S. Ct. 1376, 1387-88 (2012).

When a court addresses a single claim of ineffective assistance, "there is no reason . . . to address both components of the inquiry if the [petitioner] defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. But where counsel is found to render deficient performance in two or more respects, "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)); *see also id.* at 1176-80 (demonstrating cumulative analysis).

Here, the Court will first address the prejudice prong of the *Strickland* analysis, presuming that counsel's performance was deficient as Passmore claims. Regarding the quantum of prejudice that must be shown, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is *less* than a preponderance of the evidence, *id.*, but the petitioner must show that "counsel's errors were so serious as to deprive [him] of a

fair trial," that is, "a trial whose result is reliable," *id.* at 687.

**B. Pertinent Facts**

Although the underlying events occurred in 1998, the criminal trial of

Passmore was conducted in 2007. Most of the course of events leading up to the

criminal trial were explained to the jury.

In 1997, Passmore became the ordained pastor of a church in Livingston,

Montana. The R. family joined the church in the spring of 1998. In December

1998, Mr. and Mrs. R. reported to a former pastor that their daughters, C. and J.,

said Passmore touched them inappropriately. Their former pastor contacted Rev.

Jake Popejoy, the regional overseer for the church organization, who traveled to

Livingston with another church official to meet with Passmore and the R. family.

Through Popejoy, the church conducted an investigation and a hearing to

find facts and decide how to respond.[2] The hearing occurred in a local hotel room,

with witnesses (including the girls, accompanied by Mrs. R.) answering and posing

questions while in close physical proximity to Passmore and the church officials.

The church's proceedings focused on the same events and occasions—at the

church and parsonage and on church outings—that were later the focus of the

criminal trial. Prior to the church hearing, C. and J. each wrote an account of

---

[2] To avoid invading the jury's province, the trial court limited the parties' ability to use the church's findings and conclusions. The information contained within this paragraph was not presented to the jury.

Passmore's objectionable actions.  At the hearing, Passmore, C., J., and Mrs. R. spoke about the allegations.  A church official made detailed notes of what was said at the hearing.

On December 30, 1998, about 20 days after the allegations were made, Passmore and his family left the Livingston church and moved to Georgia.  The R. family eventually left the church but remained in Livingston.

Over three years later, in 2002, Mr. R. did some plumbing work for a lawyer, Mark Hartwig, and informally discussed the situation with him.  Hartwig told Mr. R. he should go to the police.  J. and Mr. R. both testified that they went to the police together in 2002.  C. was not with them.  J. testified that she gave a full account of what occurred to Detective Michelle Morris.  But Morris testified that she only remembered Mr. R. coming to speak to her.  Morris said she opened a file but could not do anything without a statement from the victim, so she closed the file.  The police took no action at that time.

In late 2004 or early 2005, Mr. R. and Hartwig ran into each other again. Hartwig took on the R. family as clients and also agreed to seek criminal prosecution.  In April 2005, Hartwig filed a civil lawsuit on behalf of C., J., A.M., Mrs. R., and Mr. R. against the church, Passmore, Popejoy, and one other church official. The civil lawsuit was settled and thereafter dismissed.  The amount of the settlement was confidential, but Passmore testified that he personally paid nothing.

After filing the civil suit, Hartwig consulted the new county attorney about pursuing criminal charges. The criminal case against Passmore was filed in April 2006.

As a result of this series of events, several of the witnesses who testified at Passmore's criminal trial had made prior statements—in the church proceedings or in the civil lawsuit—about the allegations at issue in the criminal trial.

Claims 1 and 2 arise from the foregoing facts. First, Passmore contends that counsel was ineffective because he failed to call Popejoy to testify about statements made in the church proceedings. Second, he contends that counsel was ineffective because he failed to recognize or use certain other prior inconsistent statements by trial witnesses. As noted above, the Court will consider first whether Passmore was prejudiced by counsel's performance.

**C. Prejudice Analysis**

Passmore presents a trail of details that could conceivably be important to a reasonable juror. So the Court must analyze what evidence could have been admissible and whether all the admissible but absent evidence adds up to a reasonable probability that the jury would have acquitted Passmore on one or more counts. To answer the question, the Court must consider what the State was required to prove; specify the evidence that Passmore suggests could have been presented at trial; and, finally, decide whether the additional evidence materially

alters the nature or balance of the evidence that was presented to the jury.

## 1. Elements of the Counts of Conviction

To prove sexual assault as charged in Counts I, IV, and V, the State had to prove beyond reasonable doubt that Passmore knowingly subjected C. and J. to sexual contact without consent. Mont. Code Ann. § 45-5-502(1) (1997). "Sexual contact" meant "any touching of the sexual or other intimate parts of the person of another for the purpose of arousing or gratifying the sexual desire of either party." *Id.* § 45-2-101(65). The girls' lack of consent was established by their ages. *Id.* § -502(5).

To prove sexual intercourse without consent as charged in Count II, the State had to prove beyond reasonable doubt that Passmore knowingly penetrated C.'s vulva "for the purpose of arousing or gratifying the sexual desire of either party." *See id.* §§ 45-5-503(1), -2-101(66). "Any penetration, however slight, is sufficient." *Id.* § -101(66).

## 2. Additional Evidence and Its Relevance

Passmore identifies five sometimes overlapping sources of additional evidence to be considered in the prejudice analysis: (1) Reverend Jake Popejoy's testimony, (2) prior statements made at the church hearing, (3) prior statements in J.'s, C.'s, and Mrs. R.'s depositions in the civil case, (4) statements reported in Detective Steffins' notes, and (5) the verified civil complaint filed by the R.

9

family.[3]

## a. Popejoy

Although Popejoy was not a witness at trial, his name was mentioned several times because he was the principal official involved in the church's 1998 investigation. The church's obligation to report the girls' allegations to authorities was the source of considerable confusion at trial, perhaps unnecessarily so.[4]

In his deposition in the civil case, Popejoy testified that he and another church official, Ray Alexander, consulted the county attorney, the church's own counsel, and Mike Doyle, a private attorney in Livingston, to clarify the church's reporting obligations under Montana law. Popejoy Civil Dep. at 18:13-19:2 (Doc. 58-3 at 6), 26:11-27:11 (Doc. 58-3 at 8); *see also id.* at 68:4-17, 73:25-74:9 (Doc. 58-3 at 18, 20); Mont. Code Ann. § 41-3-201(4)(b), (c) (1997). Mike Doyle

---

[3] Passmore concedes that Watson had a reasonable strategic basis for not calling Dr. Hillegass as a witness. *See* Passmore Br. (Doc. 56) at 19. Her potential role as a trial witness will not be further considered.

[4] In 1997, at the time of trial in 2007, and still today, Montana law requires certain professionals, including members of the clergy, to report information indicating child abuse or neglect to state officials. *See* Mont. Code Ann. § 41-3-201(1), (2)(h) (1997). But a member of the clergy is exempt from the reporting requirement if the person who provides the information to the clergy member "does not consent to . . . disclosure" or "if the communication is required to be confidential by canon law, church doctrine, or established church practice." *Id.* § -201(4)(b)(iii), (c); *see also* Mont. Code Ann. § 41-3-201(6)(b), (c) (2015); Doyle Letter (Doc. 55-2 at 41-43) (quoting subsection (b)).

By contrast, the priest- or pastor-parishioner privilege is today and has been, since at least 1977, an evidentiary privilege unrelated to the reporting obligation. *See* Mont. Code Ann. § 26-1-804 (2015). At trial, Watson and others repeatedly used the word "privilege" in connection with reporting requirements. *See, e.g.*, Trial Tr. at 44:3-5, 316:2-9, 539:21-540:4, 842:11-843:9; *see also id.* at 532:16-532:25 (prosecutor questions Mr. R. about "privilege"). In his deposition, Watson said, "I think that Popejoy knows that he violated the mandatory disclosure laws in Montana by failing to disclose this to law enforcement." Watson Dep. at 49:1-18.

testified at the trial. Doyle's opinion letter was addressed to Popejoy. *See* Letter (Doc. 55-2 at 41-43). When Doyle testified, the prosecutor focused the jury's attention on the fact that Doyle's testimony and opinion letter depended entirely on facts reported to him by Popejoy. *See* Trial Tr. at 948:2-950:12.

Passmore's defense counsel Watson called Daryl "Bill" Harper, a church official, and asked him whether the church had "any policy regarding not reporting sexual abuse to the law enforcement." Harper responded, "No, we have to report it." Trial Tr. at 789:17-19. He also said he did not know why the allegations in this case were not reported to police and twice said it was not his call to make. *Id.* at 792:6-793:10, 794:6-19.

Doyle testified after another witness called by Watson had impugned Popejoy's honesty. Watson called Mark Hartwig, the lawyer who represented the R. family in the civil lawsuit, to testify about the process by which the allegations were finally reported to police. But, after Watson elicited those facts, he went on to ask Hartwig whether he had "any knowledge of when anybody from the church went to . . . the County Attorney or the police," Trial Tr. at 839:8-24, to verify the scope of any reporting obligation. Hartwig could not answer from personal knowledge, but offered this response:

> Testimony was given to us by Popejoy, and one other person, that they went to the County Attorney. We don't know if it's true. At the time, we had a problem with whether it was true, or not. I can't tell you whether they did or did not go.

11

*Id.* at 841:21-24.

The Court will assume that if Popejoy had testified the jury may not have heard any of this equivocal or negative testimony from Doyle, Harper, or Hartwig. Popejoy was a person trusted by the church, and he had a background in law enforcement, including some time spent as a chaplain with the FBI. The Court will also assume that Popejoy would have been perceived as a forthright and credible witness.

Passmore avers that Popejoy might have provided additional impeachment evidence, as explained in the following subsection (b). Popejoy's testimony that Mr. and Mrs. R. asked him not to report the girls' allegations might also have been relevant to Passmore's intent, as explained below under point (3).

### b. Minutes of the Church Hearing

Passmore claims that Popejoy could have presented prior inconsistent statements to the jury. But Popejoy did not testify to these in his civil deposition, and he did not remember the facts at the time of his deposition in this matter. *See* Popejoy Habeas Dep. (Doc. 55-1) at 98:13-18. Therefore, there is no evidence he could have testified to these facts at trial. Even so, given proper foundation, the trial court might have admitted portions of the minutes of the church hearing under Mont. R. Evid. 802(5). *See, e.g., State v. Ottwell*, 779 P.2d 500, 504-05 (Mont. 1989); Popejoy Habeas Dep. (Doc. 55-1) at 47:22-48:8, 49:15-50:24, 92:18-93:25,

98:19-21, 102:20-104:6.  Thus, the Court will consider the minutes.

In connection with Count I, Passmore emphasizes C.'s testimony at trial that she went into Passmore's house because she got white paint on her shorts from the trim on the shed.  Watson cross-examined her by using her deposition in the civil case, which offered a conflicting account of where Passmore's wife Erika was at the time and whether or when C. returned to pick up her windbreaker pants or shorts.  *See* Trial Tr. at 385:13-392:13, 396:7-397:5.

In redirect, C. was permitted to read into the record the statement she wrote in 1998 before the church hearing. *See* Trial Tr. at 458:21-463:5.  In that statement, contrary to her trial testimony on direct examination, C. said Passmore invited her into the house because it was raining and she was cold.  C. also said Erika was at the doctor's office. *Id.* at 461:15-20.  C.'s written statement was consistent with her statements at the church hearing.

What was missing from trial was the indication in the minutes that Passmore had refuted C.'s account by presenting evidence that it did not rain on any day that Erika went to the doctor.  *See* Pet'r Resp. (Doc. 68) at 21; Trial Tr. at 399:5-11. Therefore, the jury did not have the opportunity to decide whether C. changed her story to fit new facts.

But the minutes also show C.'s response to the new facts.  Passmore's evidence did not prompt C. to change the reason she went into the house.  C.

maintained she went into the house because it was raining and said in response that Erika must not have been at the doctor's. Consequently, although the jury did not know what C. said at the hearing, it did know that she gave conflicting accounts of why she went into the house. The minutes add no more than another instance in which C. did not know where Erika was—a relatively peripheral point on which C. was thoroughly cross-examined at trial.

Passmore's briefing does not identify any other point in the minutes that might have been brought to the jury's attention. Therefore, the minutes will not be further considered.

### c. Civil Depositions

Passmore contends that Watson should have impeached J. with her civil deposition—or, more accurately, with more of her civil deposition.

At trial, J. testified that Passmore's actions at the Big Timber water slides made her "uncomfortable, but [she] thought it was an accident" until she reinterpreted in light of later events. She told the jury Passmore's "inner forearms" were "in contact with [her] breasts" as they went down the water slide. She also said he "grabbed a hold" of her "[a]round [her] chest" again when they hit the water at the bottom of the slide. Trial Tr. at 561:1-563:15.

In her civil deposition, J. said that, as she and Passmore went down the water slide, "his arms were over my chest," but "he didn't put his hands on [her]

14

breasts." She also said, as she did at trial, that she thought his contact was "[a]ccidental." But J. also said that, at the bottom of the slide, Passmore "swam by" her and "brushed" her body with "[h]is arms" "as he was swimming." And she said that, at the top of the water slide, she sat in front of Passmore, he pulled her back to lean against him, and she "didn't feel comfortable laying on another man." J. Dep. at 59:1-61:20, 158:23-160:8 (Doc. 58-2 at 17-18, 42).

J. consistently said she believed, at the time of the trip to Big Timber, that Passmore touched her breasts accidentally, as Watson reiterated. *See* Trial Tr. at 584:19-22. But J. was not fully consistent about what happened at the bottom of the water slide. *See* Passmore Br. at 19-20. Passmore's brushing her as he swam by was not the same thing as wrapping his arms around her chest again, as she said at trial. In addition, J.'s written statement said that she sat in front on the slide with C. behind her and Passmore behind C. Written Statement (Doc. 18-4) at 4. In that account, she was not "laying on" Passmore.

J.'s trial testimony portrayed Passmore's acts differently than her written statement or her civil deposition. This discrepancy must be weighed in the prejudice analysis.

### d. Detective Steffins' Notes

In the Amended Petition, a footnote states that Detective Steffins' notes said "Passmore grabbed [J.'s] breasts at least three times" and "he put his hands under

her bathing suit on her breasts as well as over the top of her suit." Am. Pet. (Doc. 18) at 45 n.6.

But Steffins' notes are not admissible, and Passmore has not suggested what Steffins would have said had he been called to testify. *See* Pet'r Br. (Doc. 56) at 18-19 n.10. Passmore points to no admissible evidence that J. made the statements the Amended Petition indirectly attributes to her. So far as the Court can tell, nothing in the record of the case suggests that J. ever said Passmore put his hands on her breasts.[5] Therefore, Steffins' notes will not be further considered.

### e. Statements in Verified Complaint

Passmore suggests the R. family made demonstrably false statements in their verified complaint in the civil case. The statements alleged that the church failed to investigate the allegations and caused the R. family to forego reporting Passmore's conduct to law enforcement; that C. was "diagnosed to be suffering from post-traumatic stress disorder as a direct result" of Passmore's "sexual assaults and abuses" and "the subsequent abuse at the hands of the defendant churches"; and that J. "developed substance abuse problems." Am. Pet. at 47-48 (citing Verified Compl.).

Passmore asserts that those statements "placed false blame on Passmore"

---

[5] C. testified at trial that Passmore engaged in this conduct with her, which was charged in Count 3. *See* Trial Tr. at 342:16-343:25; 418:3-422:17, 467:25-468:12. Passmore was acquitted of Count 3.

and showed that C. and J. "had a general disposition towards dishonesty." Pet'r Br. at 19 (citing Am. Pet. (Doc. 18) at 46-48). But Passmore does not adduce any testimony impeaching the statements about C.'s diagnosis or J.'s substance abuse problems. His pleading mentions Dr. Hillegass's report, Am. Pet. at 48-49, but it was and is inadmissible. Passmore does not suggest anyone in the R. family admitted they chose not to contact law enforcement.

The R. family's allegation that the church failed to investigate may have been contradicted by their deposition testimony. *See* Am. Pet. at 48; *see also, e.g.*, Mrs. R. Dep. at 155:9-158:2, 206:7-209:16, 292:20-293:7 (Doc. 58-2 at 90-91, 103-04, 122-23); J. Dep. at 105:13-107:9, 183:24-185:19 (Doc. 58-2 at 29, 48). But the word "investigate" may reasonably mean different things to different people. In addition, the members of the R. family did not say at Passmore's trial that the church failed to investigate. And the truth of the matter—whether the church could be fairly said to have investigated—was irrelevant. This discrepancy will be omitted from the prejudice analysis.

### 3. Evidence of Passmore's Intent Presented at Trial[6]

As evidence generally supporting intent, the State introduced evidence that Passmore engaged in inappropriate or prurient conduct on various occasions.

C. said Passmore tickled her frequently, once touched her thigh near her

---

[6] The jury acquitted Passmore on Counts VI, VII, and VIII, all involving A.M. Neither party has suggested her testimony is relevant here.

crotch while she was a passenger in his truck, and held his hands over her breasts, between her t-shirt and swimsuit as well as under her swimsuit, as they went down a water slide at Big Timber.[7] C. also said Passmore asked her whether she had started menstruating. The R. family said Passmore often called to ask the girls, especially C., to come to the church or parsonage to help out with some chore or task. Passmore and his wife Erika testified C. frequently came over uninvited.

J. testified that she saw Passmore tickle C. Trial Tr. at 563:16-564:6. She testified about Passmore's behavior on a few occasions at the parsonage. On one occasion, as she was carrying laundry upstairs, Passmore followed her into his bedroom, asked her whether she had started menstruating and whether she had ever been "tickled all over," and asked her to lay down beside him on the bed so he could tickle her. On another, she was watching his daughter and picking up toys in the living room when he grabbed her by her hips and sat her on his lap. On the third, J. said that, during a water fight at the parsonage with others present, Passmore suggested the girls could remove their shirts because they were wearing bras. *See* Trial Tr. at 556:17-559:23.

Mrs. R. testified that she brought Passmore a cup of coffee one Saturday morning, and he "made the remark that he liked his women the same way he liked his coffee, and that was dark and hot." She explained that "from the background

---

[7] This conduct was the basis of Count 3, on which Passmore was acquitted.

that I had, that was just something that a pastor wouldn't say." *Id.* at 487:10-22.

As described in connection with Claim 1, there was also the recurring suggestion that the church failed to comply with the law and discouraged the R. family from speaking to law enforcement authorities. The church's conduct was not directly relevant to any count, but it was important in explaining the time lag between 1998 and trial in 2007. In addition, because Mrs. R. and Mr. R. testified that they were discouraged from reporting and Popejoy was not available to rebut that testimony, an appearance of concealing guilty knowledge was created. By contrast, had Popejoy's testimony been presented and believed, a reasonable juror might think that a parent who believed the girls had been sexually assaulted—as opposed to merely having been subjected to conduct unbecoming of a pastor— would have wanted to go to the police.

Finally, the State introduced testimony from a parishioner, Edna Miller. Miller testified that she walked into the church nursery one day and saw Passmore sitting on the floor with C. straddling his knees, "joggling" her up and down. Miller testified that both jumped up when they saw her. C. said, "He's teasing me." Passmore looked "kind of red-faced," said he had a form to show Miller (a form she had already seen), and told C. to park her bicycle in the back next time she came to the church. Miller also said that she did not "see anything hurting" in Passmore's conduct but considered it "kind of odd." Trial Tr. at 472:2-477:22.

## 4. Count-by-Count Analysis

Taking into account the potentially admissible evidence that Passmore claims defense counsel failed to present, the following charts summarize, as to each count, the evidence presented at trial, as compared to additional evidence the jury was not able to consider.

Count I:  sexual assault against C. in the parsonage or in the shed

| Evidence at Trial | Additional Evidence |
| --- | --- |
| Passmore touched C.'s breasts both over and under her bra in the parsonage when she got white paint on her shorts or windbreaker pants and went inside to wash and dry them; she could not remember whether she returned later to retrieve the windbreakers.  And, in the shed, Passmore "tickled" C., then touched her breasts and tried to touch her genitalia. | At no point in their interaction with Popejoy did either girl "claim that touching went beyond the top of the clothing."[8] |

Count II:  sexual intercourse without consent against C. in the sanctuary

| Evidence at Trial | Additional Evidence |
| --- | --- |
| C. was vacuuming in the sanctuary when Passmore asked her to sit by him, asked her whether she had begun menstruating, started to tickle her until she fell on the floor, then pinned her hands over her head while he digitally penetrated her vagina.  But C. would not be surprised to learn she failed to say, in 1998, that Passmore penetrated her, | Neither girl claimed that touching went beyond the top of the clothing.  Popejoy did not recall whether the girls did or did not allege penetration.[9] |

---

[8] *See* Popejoy Civil Dep. at 33:22-34:7 (Doc. 58-3 at 10); Popejoy Habeas Dep. (Doc. 55-1) at 89:1-11.

[9] *See* Popejoy Habeas Dep. at 49:9-11, 89:12-19.

| | |
|---|---|
| because she better understood what happened in later years. | |

Count IV: sexual assault against J. at the Big Timber waterslides

| Evidence at Trial | Additional Evidence |
|---|---|
| At trial, J. testified Passmore pulled her back to lean against him and his "inner forearms" were "in contact with [her] breasts" as they went down the water slide. J. "felt uncomfortable" but thought "it was an accident" until she reinterpreted the matter in light of later events. (J., 562-63; written statement). | J. sat in front of Passmore, he pulled her back to lean against him, touching her "underneath" her breasts, and she "didn't feel comfortable laying on another man." J. Dep. at 59:1-61:20, 158:23-160:8 (Doc. 58-2 at 17-18, 42). |
| | J. sat in front with C. behind her and Passmore behind C. (Written Statement (Doc. 18-4) at 4). |
| Passmore "grabbed a hold" of J. "[a]round [her] chest" again when they hit the water at the bottom of the slide. She "felt uncomfortable, but I thought it was an accident." | Passmore "brushed up against" J. and "grabbed" her "when [she] was underneath the water." She "thought he was going to hold [her] underwater or something." J. Dep. at 57:6-8, 61:3-5 (Doc. 58-2 at 17-18). |
| | In the pool at the bottom of the slide, Passmore "swam by" her and "brushed" her breasts with "[h]is arms" "as he was swimming" and "[p]eople were scrambling to get out of the way of the slides." She thought this contact was also "[a]ccidental." J. Dep. at 159:9-160:8 (Doc. 58-2 at 42). |

Count V: sexual assault against J. at Chico Hot Springs

| Evidence at Trial | Additional Evidence |
|---|---|
| Passmore pinched J.'s buttocks three times | |
| J. "elbowed him in the face, and took a swing with my right hand"; her elbow | |

| "connected" and she saw Passmore "with his hands over his face" | |
|---|---|
| Mr. R. saw J. take a swing at Passmore | |

After considering in detail all of the evidence, the Court is firmly convinced that the additional evidence does not materially alter the picture presented to the jury at trial. What does not change is more important than what changes with the additional evidence.

As to Counts I and II, Popejoy's testimony that C. did not claim she was touched under her clothing could have been significant. A reasonable juror would view touching on top of the clothing as more likely to be accidental and might be more hesitant to believe C. on Count I if persuaded she embellished her testimony by including touching under her bra. For two reasons, however, this additional evidence does not give rise to a reasonable probability that Passmore would have been acquitted. First, Popejoy's testimony that he did not recall whether the girls did or did not allege penetration in 1998 was not necessarily inconsistent with C.'s testimony that she would not be surprised if she did not allege penetration in 1998.

Second, combined with the other trial testimony regarding Passmore's intent, Edna Miller's testimony was strong evidence of Passmore's sexual interest in C. Miller said she stood looking at Passmore and C. for "thirty to forty, forty-five seconds" before they realized she was there. The image of Passmore sitting on the floor and "joggling" C. "up and down" as she sat in front of him, clad in shorts

with her legs spread to straddle his knees, was damaging to the defense, particularly when combined with Miller's testimony that it lasted for thirty or more seconds and stopped only when Passmore realized Miller was present. Popejoy's testimony would have added nothing to undermine the force of Miller's testimony. Passmore does not identify any other evidence that would have done so. There is no reasonable probability that Passmore would have been acquitted on either Count I or Count II if Popejoy had testified.

As to Counts IV and V, the counts involving J., the manner in which the allegations came to light served a role similar to Edna Miller's testimony on Counts I and II. There was no evidence to counter Mr. R.'s, Mrs. R.'s, and J.'s testimony that Mr. R. asked J. in the car on their way home from Chico to explain why she "took a swing at" Passmore in the pool. It was possible that J. was mistaken, and someone other than Passmore pinched her. But the jury decided at trial that J. was not mistaken, and Passmore adduces no additional evidence on Count V.

Count IV poses the closest question. J. did not tell exactly the same story in her written statement, her civil deposition, and at trial. But J. consistently said Passmore put his arms around her while they went down the water slide together. The variations were comparatively minor and not even necessarily inconsistent with each other. J. did not tell the jury about Passmore swimming by her at the

bottom of the slide, but that was an extra incident of contact, not an incident different from the contact about which she did testify. J. did not say anything at trial about being underwater at the bottom of the slide when Passmore put his arms around her chest, but she was not asked about that. Her written statement put Passmore behind C., so that J. would not have been laying back on him, but she testified at trial that she went down the slide twice with Passmore, and she did not comment on laying back on Passmore in her trial testimony. The central point at issue did not change: at trial, the jury had to decide whether Passmore touched J.'s breasts with his inner forearms for purposes of sexual gratification. The additional evidence available in J.'s deposition and written statement does not contribute to or detract from the balance of the evidence on that point.

If the additional evidence available to Passmore on Count IV had been presented to the jury, it is not reasonably probable that the jury would have acquitted him on either Count IV or Count V.

### III. Claims 4 and 5

Passmore's fourth and fifth claims allege that one of the jurors was biased against him (Claim 4) and that counsel was ineffective for failing to act on information about the juror's bias (Claim 5). Claim 5 is governed by the *Strickland* standard, set forth above in Part II.A. As to Claim 4, the presence of a single biased juror deprives the defendant of a fair trial. No other prejudice need

be shown. *See Fields v. Woodford* ("*Fields I*"), 309 F.3d 1095, 1103 (9th Cir. 2002). Conversely, even if counsel's performance was deficient with respect to the juror's seating, the prejudice prong of the *Strickland* test cannot be met if the juror in question was not biased. *See Fields v. Brown* ("*Fields II*"), 503 F.3d 755, 776(9th Cir. 2007) (en banc). Again, the Court will address first the prejudice prong, assuming a finding that defense counsel was ineffective.

These claims are based on statements by two persons, George Denton and Tammy Haefs. Denton averred that juror Dixie Jimison falsely represented that she had no opinion about Passmore's guilt or innocence when she had previously told Denton that she knew Passmore to be guilty. Haefs also reported hearing Jimison say, after trial, that she knew all along Passmore was guilty. Denton, Haefs, and Jimison were deposed in this habeas case.

In his deposition, Denton described what he remembered about Jimison's remark:

> [S]he asked me, Are you still going to that church where that pastor is accused of—I think she used the words "child molestation," I'm not sure. Anyway, I said, Yes, I am. She said, Well, I believe he's totally guilty—or I can't remember the exact words, but I remember the incident very well. Anyway, she said something to that effect. She believed he was guilty. And I just said, Oh, and walked out.

Denton Dep. (Doc. 55-9) at 23:13-21. Denton thought this encounter probably occurred in 2005. *Id.* at 22:24; *see also* Jimison Dep. (Doc. 55-4) at 11:9-16, 31:9-32:7.

But Denton also testified that Jimison did not say she had information about the case. Denton Dep. at 38:21-23. He testified that she did not say she discussed the case with C., who worked the opposite shift at the Pamida where Jimison worked. *Id.* at 38:24-39:15. Although Denton represented that Jimison "knew a lot about the case" and testified that he knew "she followed it in the newspaper," *id.* at 21:8-18, he also acknowledged that Jimison did not ever tell him that she knew a lot about this case, *see also, e.g.*, *id.* at 38:21-23. And he didn't remember if Jimison ever told him that she read about the case in the newspaper. *Id.* at 39:16-18.

Denton had nothing more to offer than the alleged remark. Neither does Passmore. *See* Jimison Dep. (Doc. 55-4) at 33:9-16; 38:22-25 (testifying that she did not have information about the case and had not formed an opinion about it). The brief remark, even assuming Jimison made it, does not prove Jimison was unable to be an impartial juror. People may offer opinions when they lack supporting evidence and have not really thought the matter over. That does not necessarily mean that they are wedded to these opinions, or even remember what they were, more than a year later. The Court cannot assume that everyone who makes such a remark in casual conversation is incapable of setting aside their opinions, opening their minds, listening to testimony, and weighing evidence if and when they are later called to serve as a juror.

Haefs testified that she heard Jimison say, "right after the criminal trial" but "before the newspaper had released anything," that Passmore "was guilty and that she had always known he was." Haefs Dep. (Doc. 55-11) at 19:18-23; *see also* Pet'r Br. at 18 n.12 (suggesting time frame); Trial Tr. at 1112:15-1113:2, 1119:13-16. Haefs denied that she heard Jimison say she had been hoping to be on the jury. Haefs Dep. at 24:3-14.

Again, however, merely having made a remark—even making two remarks—does not undermine the verdict. To support further proceedings on Claims 4 and 5, the Court would have to find some reason to believe not only that Haefs accurately remembers that Jimison used the words "always knew," but also that, by "always," Jimison meant "before I ever heard any evidence" and "regardless of the evidence I heard or the instructions I was given about the burden of proof or the oath I took." Taking Denton's and Haefs' depositions together, Passmore provides no reason to suppose Jimison was, at the time of Passmore's trial, impervious to evidence and deaf to obligation.

Despite an opportunity to develop the facts, Passmore points to no competent evidence supporting an inference that Jimison was unable to render an impartial verdict or that she had any duty to say more than she did during voir dire. Claim 4 is denied for lack of factual support.

Regarding Claim 5, as the *Fields II* court said with respect to the petitioner's

affiliated claim of ineffective assistance of counsel, there is no reasonable probability that the outcome of the proceeding would have been different if "one unbiased juror" had been replaced "with another unbiased juror." *Fields II*, 503 F.3d at 776. In other words, a competent defense attorney, timely advised of Jimison's pretrial remark, might indeed have used a peremptory strike against her. But it would be possible to find an objectively reasonable probability that use of a peremptory strike against Jimison would have produced a different outcome only if it were possible to find that Jimison's ability to deliberate impartially was tainted by actual or implied bias. And actual or implied juror bias cannot be demonstrated by Jimison's alleged remarks. Therefore, Claim 5 is also denied for lack of factual support.

## IV. Claim 7

Claim 7 also fails for lack of factual support. One of the bailiffs, Norm Frazier, testified in his deposition that he saw one of the girls ask her mother what she should say in her testimony. But he said the girl asked the question by "talking to herself" and saying "What am I supposed to say, what am I supposed to say?"— all while she was testifying before the jury and her mother was seated in the gallery. *See* Frazier Dep. (Doc. 55-13) at 15:12-17:10, 24:16-25:14, 28:13-29:4, 29:18-25, 32:10-36:13; *see also id.* at 9:12-15 (describing where bailiff sits). Whatever the girl said or did on the stand at trial, Passmore has not pointed to any

evidence that anyone influenced the girls' testimony without the jury's knowledge. This claim is denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Despite an opportunity to conduct discovery, none of Passmore's claims makes a showing with any substance to it that he was deprived of a constitutional right. Assuming that counsel's performance was deficient with respect to obtaining one witness's presence at trial and with respect to additional sources of prior inconsistent statements, all the evidence presented at trial, combined with all the evidence omitted as a result of counsel's deficiencies, does not add up to a reasonable probability of acquittal on any of the counts of conviction (Claims 1, 2, and 6).

Passmore was not prejudiced by counsel's failure to call George Denton or Hal Haefs to testify at trial (Claim 1) or by counsel's failure establish an accurate timeline of the incidents at issue (Claim 3). The jury knew the timeline was unclear, and the subject of Denton's and Haefs' testimony was adequately covered by Levi Haefs, who was in a better position to know the facts he was testifying about. *See* Order (Doc. 33) at 7-16.

Passmore's claim of juror bias (Claim 4) is supported by two offhand remarks made by a person who served as a juror. The first was made more than a year before trial and does not indicate the juror was unable to be impartial at trial. The second was made shortly after the verdict, but Passmore proffers no reason to interpret it to mean the juror fixed her verdict before hearing and weighing all the evidence. Because Passmore cannot show the juror was biased, he also cannot show that counsel was ineffective on the issue (Claim 5).

Finally, there is no evidence that anyone influenced either of the girls' testimony without the jury's knowledge (Claim 7).

Passmore was convicted of four serious charges and sentenced to a long prison term. But the jury heard the evidence and considered the questions it needed to consider to make their decision. It obviously considered the counts carefully, because Passmore was acquitted on four counts. Reasonable jurists would find no basis to encourage further proceedings. A COA will be denied.

Based on the foregoing, the Court enters the following:

## ORDER

1.  Claims 1, 2, 4, 5, 6, and 7 are DENIED for lack of merit.  Claim 3 and the remainder of Claim 1 having been denied previously, *see* Order (Doc. 33) at 22 ¶¶ 1-2, Passmore's amended petition (Doc. 18) is DENIED.

2.  The Clerk of Court shall enter, by separate document, a judgment in favor of Respondents and against Petitioner.

3.  A certificate of appealability is DENIED.

DATED this 5th day of August, 2016.


*/s/ Carolyn S. Ostby*
Carolyn S. Ostby
United States Magistrate Judge